MELISSA MEEKER HARNETT (Bar No. 164309)
  mharnett@wccelaw.com
GREGORY B. SCARLETT (Bar No. 131486)
  gscarlett@wccelaw.com
**WASSERMAN, COMDEN, CASSELMAN & ESENSTEN, L.L.P.**
5567 Reseda Boulevard, Suite 330
Post Office Box 7033
Tarzana, California 91357-7033
Telephone: (818) 705-6800 • (323) 872-0995
Facsimile:  (818) 705-8927

Attorneys for Plaintiff,
Stephen J. Rush, individually and
on behalf of all others similarly situated

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| STEPHEN J. RUSH, individually, and on behalf of all others similarly situated,<br><br>         Plaintiffs,<br><br>   vs.<br><br>NUTREX RESEARCH, INC.; JEFFREY A. MCCARRELL; JENS O. INGENOHL; and DOES 1-50, inclusive,<br><br>        Defendants. | CASE NO.  3:12-CV-01060 LB<br><br>**PUTATIVE CLASS ACTION**<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS JEN O. INGENOHL AND NUTREX RESEARCH, INC'S MOTION TO DISMISS PLAINTIFF STEPHEN J. RUSH'S COMPLAINT**<br><br>Date:    June 7. 2012<br>Time:   11:00 a.m.<br>Crtrm:  C<br>Judge:  Honorable Laurel Beeler |

WASSERMAN, COMDEN, CASSELMAN & ESENSTEN, L.L.P.
5567 RESEDA BOULEVARD, SUITE 330
POST OFFICE BOX 7033
TARZANA, CALIFORNIA 91357-7033

1023752.1

3:12-CV-01060 LB

Plaintiff's Opposition to Defendant's Motion to Dismiss

## TABLE OF CONTENTS

Page

I.      INTRODUCTION ..........................................................................................0

II.     STATEMENT OF FACTS .........................................................................2

        A.    DEFENDANTS DECEPTIVELY FAIL TO DISCLOSE MATERIAL FACTS
              CONCERNING THE SAFETY AND EFFECTIVENESS OF THE NUTREX
              PRODUCTS. ...................................................................................3

              1.    DMAA is an Unsafe, Synthetic Compound Banned by Sports
                    Organizations And Countries. ...............................................3

              2.    The Labeling of Nutrex Products is Deceptive. ....................5

        B.    DEFENDANTS VIOLATE THE SHERMAN LAW. .................................6

III.    LEGAL STANDARD ..................................................................................9

IV.     THE COURT SHOULD DENY DEFENDANTS' MOTION TO DISMISS
        BECAUSE THE COMPLAINT IS SUPPORTED BY LEGALLY
        COGNIZABLE THEORIES. .....................................................................10

        A.    DEFENDANTS COMPLETELY MISCONSTRUES THE ENTIRE COMPLAINT. ..............10

        B.    THE COMPLAINT STATES COGNIZABLE CLAIMS BECAUSE DEFENDANTS
              DID NOT ATTACK ALL BASIS FOR PLAINTIFF'S CAUSES OF ACTION. ..................11

        C.    THE FDCA HAS NO PREEMPTIVE EFFECT AND PLAINTIFFS' CLAIMS DO
              NOT REQUIRE FDA INTERVENTION. .........................................13

              1.    Plaintiff's Claims Under California Consumer Protection
                    Statutes And Labeling Laws are Not Preempted by the FDCA. ..........13

              2.    DEFENDANTS' PRIMARY JURISDICTION ARGUMENTS ARE
                    UNAVAILING. ......................................................................18

        D.    DEFENDANTS HAD A DUTY TO DISCLOSE YET FAILED TO DISCLOSE. .................19

        E.    DEFENDANT'S CONDUCT IS UNLAWFUL. .....................................21

              1.    Contrary to Defendants' Arguments, Because DMAA is Not a
                    "Dietary Ingredient," Nutrex Products are Not Dietary
                    Supplements. ......................................................................21

              2.    Defendants Make Illegal Drug Claims on the Labeling of Nutrex
                    Products. ............................................................................22

              3.    Defendants' "Ultra Concentrate" Labeling Claim is an
                    Unauthorized Nutrient Content Claim. ..............................24

V.      ALTERNATIVELY, THE COURT SHOULD GRANT LEAVE TO AMEND. .........25

WASSERMAN, COMDEN, CASSELMAN & ESENSTEN, L.L.P.
5567 RESEDA BOULEVARD, SUITE 330
POST OFFICE BOX 7033
TARZANA, CALIFORNIA 91357-7033

Plaintiff's Opposition to Defendant's Motion to Dismiss

VI.    **CONCLUSION** ...........................................................................................25

WASSERMAN, COMDEN, CASSELMAN & ESENSTEN, L.L.P.
5567 RESEDA BOULEVARD, SUITE 330
POST OFFICE BOX 7033
TARZANA, CALIFORNIA 91357-7033

Plaintiff's Opposition to Defendant's Motion to Dismiss

Cases

*AE ex rel. Hernandez v. County of Tulare*,
    666 F.3d 631 (9th Cir. 2012)..................................................................... 25

*ARC Ecology v. U.S. Dep't of Air Force*,
    411 F.3d 1092 (9th Cir. 2005) ................................................................... 10

*Armstrong v. Optical Radiation Corp.*,
    50 Cal. App. 4th 580 (1997) ...................................................................... 18

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................... 10

*Astiana v. Ben & Jerry's Homemade, Inc.*,
    C 10-4387 PJH, 2011 WL 2111796 (N.D. Cal. May 26, 2011)............... 16, 17

*Balistreri v. Pacifica Police Dept.*,
    901 F.2d 696 (9th Cir. 1988)..................................................................... 11

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................... 10

*Black v. Financial Freedom Senior Funding Corp.*,
    92 Cal. App. 4th 917 (2001)...................................................................... 13

*California v. ARC America Corp.*,
    490 U.S. 93 (1989) ..................................................................................... 13

*Chang v. Chen*,
    80 F.3d 1293 (9th Cir. 1996)..................................................................... 10

*Chavez v. Blue Sky Natural Bev. Co.*,
    268 F.R.D. 365 (N.D. Cal. 2010) .............................................................. 18

*Cipollone v. Liggett Group, Inc.*,
    505 U.S. 504 (1992) ................................................................................... 13

*Clark v. Time Warner Cable*,
    523 F.3d 1110 (9th Cir. 2008) ................................................................... 18

*Consumer Justice Center v. Olympian Labs, Inc.*,
    99 Cal. App. 4th 1056 (2002)................................................................ 14, 15, 18

*Consumers Union of U.S., Inc. v. Alta-Dena Certified*,
    4 Cal. App. 4th 963 (1992)........................................................................ 18

*Cox v. Aurora Elecs., Inc.*,
    CV 93-3292 DT (JGX), 1993 WL 652792 (C.D. Cal. Oct. 18, 1993) ............... 21

WASSERMAN, COMDEN, CASSELMAN & ESENSTEN, L.L.P.
5567 RESEDA BOULEVARD, SUITE 330
POST OFFICE BOX 7033
TARZANA, CALIFORNIA 91357-7033

WASSERMAN, COMDEN, CASSELMAN & ESENSTEN, L.L.P.
5567 RESEDA BOULEVARD, SUITE 330
POST OFFICE BOX 7033
TARZANA, CALIFORNIA 91357-7033

*Delarosa v. Boiron, Inc.*,
    818 F. Supp. 2d 1177 (C.D. Cal. 2011) ................................................................ 17

*Doe v. United States*,
    419 F.3d 1058 (9th Cir. 2005) ...................................................................... 10

*Erickson v. Pardus*,
    551 U.S. 89 (2007) ......................................................................................... 9

*Falk v. Gen. Motors Corp.*,
    496 F. Supp. 2d 1088 (N.D. Cal. 2007) .......................................................... 12, 19

*Goldsmith v. Allergan, Inc.*,
    CV 09-7088 PSG EX, 2011 WL 2909313 (C.D. Cal. May 25, 2011) ...................... 20

*Hal Roach Studios, Inc. v. Richard Feiner & Co.*,
    896 F.2d 1542 (9th Cir. 1990) ...................................................................... 9

*In re Apple Comp. Sec. Litig.*,
    886 F.2d 1109 (9th Cir. 1989) ...................................................................... 21

*In re Bayer Corp. Combination Aspirin Products Mktg. & Sales Practices Litig.*,
    701 F. Supp. 2d 356 (E.D.N.Y. 2010) ............................................................ 14

*In re Farm Raised Salmon Cases*,
    42 Cal. 4th 1077 (2008) .......................................................................... 15, 16

*In re Steroid Hormone Prods. Cases*,
    181 Cal. App. 4th 145 (2010) .......................................................................... 12

*In re Sunrise Techs. Sec. Litig.*,
    C-92-0948TEH, 1992 WL 359636 (N.D. Cal. Sept. 22, 1992) ........................ 21

*In re Tobacco II Cases*,
    46 Cal. 4th 298 (2009) .......................................................................... 12

*Jackson v. Carey*,
    353 F.3d 750 (9th Cir. 2003) ...................................................................... 10

*Johnson v. Riverside Healthcare Sys., LP*,
    534 F.3d 1116 (9th Cir. 2008) ...................................................................... 9

*LiMandri v. Judkins*,
    52 Cal. App. 4th 326 (1997) .......................................................................... 19

*Lockwood v. ConAgra Foods*,
    597 F. Supp. 2d 1028 (N.D. Cal. 2009) .......................................................... 17

*Lopez v. Smith*,
    203 F.3d 1122 (9th Cir. 2000) ...................................................................... 10

*Marx v. Comp. Science Corp.*,
    507 F.2d 485 (9th Cir. 1974) ...................................................................... 21

*Maryland v. Louisiana,*
    451 U.S. 725 (1981) ......................................................................................... 13

*Medtronic, Inc. v. Lohr,*
    518 U.S. 470 (1996) ......................................................................................... 13

*Miles Labs., Inc. v. Superior Court,*
    133 Cal. App. 3d 587 (1982) ........................................................................... 21

*Mir v. Little Co. of Mary Hosp.,*
    844 F.2d 646 (9th Cir. 1988) ............................................................................. 9

*Navarro v. Block,*
    250 F.3d 729 (9th Cir. 2001) ........................................................................... 11

*Oki Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n,*
    298 F.3d 768 (9th Cir. 2002) ........................................................................... 10

*Peviani v. Natural Balance, Inc.,*
    774 F. Supp. 2d 1066 (S.D. Cal. 2011) ........................................................... 21

*Reese v. Payless Drug Stores Northwest, Inc.,*
    43 Cal. App. 4th 1317 (1995) .......................................................................... 14

*South Bay Creditors Trust v. General Motors Acceptance Corp.,*
    69 Cal. App. 4th 1068 (1999) .......................................................................... 19

*Stickrath v. Globalstar, Inc.,*
    527 F. Supp. 2d 992 (N.D. Cal. 2007) ............................................................ 21

*United States v. An Article Consisting of 216 Cartoned Bottles, More or Less,*
    409 F.2d 734 (2d Cir. 1969) ............................................................................ 23

*United States v. Undetermined Quantities of Articles of Drug,*
    145 F. Supp. 2d 692 (D. Md. 2001) ................................................................ 25

*Wash. Mutual Bank v. Superior Court,*
    95 Cal. App. 4th 606 (2002) ............................................................................ 13

*Williams v. Gerber Products Co.,*
    552 F.3d 934 (9th Cir. 2008) ...................................................................... 12, 20

*Williams v. Wells Fargo Bank, N.A.,*
    CV 10-4761 PA PJWX, 2010 WL 3184248, at *3 (C.D. Cal. Aug. 9, 2010) ..................... 16

*Wyeth v. Levine,*
    555 U.S. 555 (2009) ............................................................................. 14, 16, 19

*XOMA Corp. Sec. Litig.,*
    C-91-2252 TEH, 1990 WL 357807 (N.D. Cal. Dec. 27, 1991) ........................ 21

Statutes

21 C.F.R. § 101.54 .......................................................................................... 9, 24

WASSERMAN, COMDEN, CASSELMAN & ESENSTEN, L.L.P.
5567 RESEDA BOULEVARD, SUITE 330
POST OFFICE BOX 7033
TARZANA, CALIFORNIA 91357-7033

21 U.S.C. § 321 .......................................................................................................... passim

21 U.S.C. § 343 .......................................................................................................... passim

21 U.S.C. § 343-1 .............................................................................................................. 18

21 U.S.C. § 379r ......................................................................................................... 15, 17

Cal. Bus. & Prof. Code § 17200 .......................................................................................... 12

Cal. Health & Safety Code § 109925 ..................................................................... 8, 17, 23

Cal. Health & Safety Code § 110100 ................................................................................... 6

Cal. Health & Safety Code § 110665 .............................................................................. 6, 17

Cal. Health & Safety Code § 110670 ................................................................................... 6

Cal. Health & Safety Code § 110673 ................................................................................... 6

<u>Rules</u>

Fed. R. Civ. P. 8 .................................................................................................................. 9

<u>Other Authorities</u>

Pub.L. No. 101–535, 104 Stat. 2353, 2364 (Nov. 8, 1990) .......................................... 16

WASSERMAN, COMDEN, CASSELMAN & ESENSTEN, L.L.P.
5567 RESEDA BOULEVARD, SUITE 330
POST OFFICE BOX 7033
TARZANA, CALIFORNIA 91357-7033

# I.    INTRODUCTION

The Motion to Dismiss filed by Defendants Jen O. Ingenohl and Nutrex Research, Inc. (collectively, "Defendants") is fatally flawed in that it is based upon a misconstruction of the putative class action Complaint of Plaintiff Stephen J. Rush ("Plaintiff").  The Motion to Dismiss is entirely premised upon the false notion that Plaintiff seeks to enforce and interpret the Federal Food, Drug, and Cosmetic Act ("FDCA") and the Nutrition Labeling and Education Act of 1990 ("NLEA").  Ignoring the fact that the Complaint is premised upon false and deceptive advertising claims, Defendants use this blatant misconstruction to argue that the FDCA and NLEA preempt Plaintiff's state law claims, and that the claims should be addressed by the United States Food and Drug Administration ("FDA").

The Complaint, however, clearly and unambiguously states that Plaintiff is not seeking to enforce the FDCA or the NLEA.  (Compl. ¶¶ 12, 49.)  Rather, Plaintiff is merely attempting to remedy Defendants' deceptive and misleading claims made on the labeling of their purported "pre-workout" and "fat burning" dietary supplements.  On the labeling of these products, Defendants fail to disclose material facts concerning the nature, safety, effectiveness, and legality of the subject products—most notably, that one of the products' primary ingredients, DMAA, is a dangerous stimulant that is unsafe for human consumption, and has been banned by various countries and sports organizations.  Based upon these allegations, Plaintiff alleges claims under the California Consumers Legal Remedies Act ("CLRA"), the Unfair Competition Act ("UCL"), and the False Advertising Law ("FAL"), as well as for breach of statutory express and implied warranties, and for restitution.  All of these claims are based upon Defendants' deceptive labeling practices, which are evidenced by Defendants' violations of the California Sherman Food, Drug & Cosmetic Act ("Sherman Law"), which incorporates the applicable provisions of the FDCA governing dietary supplements.

It is well-established, by case decisions from the United States Supreme Court, the California Supreme Court, the Ninth Circuit, and California appellate courts, that claims alleging violations of provisions of California's Sherman Law, that incorporate identical provisions of the FDCA, are not preempted by the FDCA.  In fact, the FDCA specifically ***permits*** states to enact corresponding and

1    identical state laws, and the Supreme Court has stated that using state consumer protection laws to

2    attack deceptive labeling *complements* FDA enforcement.

3        In any event, Defendants' "preemption" arguments pointedly ignore two major allegations by

4    Plaintiff that are not based on violations of the FDCA: (1) that Defendants fail to disclose that

5    DMAA is a dangerous stimulate, the use of which causes serious adverse side effects and even

6    death; and (2) that Defendants make deceptive, misleading and false labeling representations

7    regarding their "dietary supplements."

8        Defendants devote a substantial portion of their brief to arguing that they have not violated

9    the FDCA, issues of fact not appropriate for resolution on a motion to dismiss. Defendants spend

10   substantial additional time arguing that Plaintiff's attempt to enforce California's Sherman Law

11   improperly expands provisions of the FDCA. Nothing is further from the truth. Plaintiff merely

12   seeks to preclude Defendants' deceptive and misleading product labeling and advertising claims,

13   which are contrary to clear and unambiguous provisions of the FDCA, which are expressly

14   incorporated into the Sherman Law.

15       Ultimately, the fatal flaw to Defendants' Motion is that Defendants fail to address the basis

16   for Plaintiff's primary theories of liability—the deceptive labeling claims and omissions concerning

17   the nature, safety, effectiveness, and legality of the Defendants' products. The failure to address

18   these theories of liability is fatal to Defendants' Motion, as each cause of action in the Complaint is

19   supported by these legally cognizable theories, notwithstanding any question of preemption.

20   Accordingly, Defendants' Motion should be denied in its entirety.

21   **II.    STATEMENT OF FACTS**

22       Defendants manufacture, distribute, market, and sell a variety of purported "pre-workout"

23   and "fat burning" dietary supplements to consumers, including: (1) "Hemo Rage Black" and "Hemo

24   Rage Black Ultra Concentrate"; (2) "Lipo 6 Black" and "Lipo 6 Black Ultra Concentrate;" and (3)

25   "Lipo 6 Black Hers" and "Lipo 6 Black Hers Ultra-Concentrate" (collectively, the "Products" or

26   "Nutrex Products"). (Compl. ¶ 1.) These Products are marketed for use as exercise and weight

27   management supplements. (*Id.*) The "Hemo Rage Black" line of Products are marketed as "pre-

28   workout" bodybuilding supplements. (*Id.*) The "Lipo 6 Black" line of Products are marketed as "fat

WASSERMAN, COMDEN, CASSELMAN & ESENSTEN, L.L.P.
5567 RESEDA BOULEVARD, SUITE 330
POST OFFICE BOX 7033
TARZANA, CALIFORNIA 91357-7033

destroyer" weight management supplements.  (*Id.*)  The Products, however, contain a dangerous stimulant as an ingredient that poses a serious health risk and has potentially life-threatening side effects.  (*Id.*)  The stimulant, which is supposedly derived from the oil of the geranium plant, is known by many names, including "1, 3 dimethylamylamine," "methylhexanamine," and "geranamine" ("DMAA").  (*Id.*)  The DMAA used in Defendants' Products is not derived from geranium oil, and is actually a purely synthetic substance.  (*Id.*)

    **A. DEFENDANTS DECEPTIVELY FAIL TO DISCLOSE AND MISREPRESENT MATERIAL FACTS CONCERNING THE SAFETY AND EFFECTIVENESS OF THE NUTREX PRODUCTS.**

       **1. DMAA is an Unsafe, Synthetic Compound Banned by Sports Organizations And Countries.**

DMAA was patented by Eli Lilly & Company in 1944 and later marketed as a drug, beginning in 1971, under the trademark "Forthane" for use as a nasal decongestant and as a treatment for hypertrophied or hyperplasic oral tissues.  (*Id.* ¶ 3.)  DMAA is a vasoconstrictor and central nervous system stimulant which is on the World Anti-Doping Agency ("WADA") and Major League Baseball ("MLB") lists of banned substances.  (*Id.* ¶ 3.)  DMAA is also totally banned in Canada and New Zealand.  (*Id.* ¶ 3.)  DMAA has recently been linked to the death of two U.S. soldiers prompting the military to removed and recall all DMAA products from its nutritional stores. (Pl.'s Req. for Jud. Notice, Ex. 1.)[1]  Experts in the industry have been extremely concerned that this potent stimulant will lead to serious health issues and even death, as was the case with ephedra before it was banned by the FDA in 2003.  (Compl. ¶ 31, Ex. 9 (Synthetic Geranium Still Raising Industry Red Flags").)

DMAA has a chemical structure similar to amphetamine and ephedrine, and can cause increases in heart rate and blood pressure, and even death.  (Compl. ¶ 45.)  DMAA is classified as a banned substance by MLB, WADA, and the United States Anti-Doping Agency.  (*Id.* ¶ 46.)  As a

---

[1] Pursuant to Federal Rules of Evidence 201, Plaintiff respectfully requests that the Court take judicial notice of the article from the National Business Journal entitled "DMAA linked to death of 2 U.S. soldiers, massive recall ensues" a copy of which is attached to Plaintiff's concurrently filed Request for Judicial Notice.

1  result, athletes in various sports throughout the world have been suspended or disqualified for

2  unknowingly using products containing DMAA. (*Id.*) The safety concerns associated with DMAA

3  have been well-documented, including concerns that DMAA is a dangerous and addictive substance

4  that can cause headache, nausea and stroke. (*Id.* ¶ 45, Ex. 16 (Washington Post Article entitled

5  "Chemist's New Product Contains Hidden Substance"), Ex. 17 (excerpt from article entitled "Jack3d

6  and other MHA-containing Supplements Fuel Adulteration, Safety Concerns").) DMAA has also

7  recently been widely used as a "designer drug" in dangerous "party pills." (*Id.*)

8         Plaintiff and his girlfriend experienced the dangerous adverse side effects of DMAA when he

9  used the Products. (*See* Compl. ¶¶ 50-51.) Relying upon the Products' labeling statements, Plaintiff

10  purchased the Nutrex Products for himself and his girlfriend. (*Id.*) When he purchased the Products,

11  Plaintiff was unaware, and the Products' labeling failed to inform him, among other things, that

12  DMAA is a potentially dangerous, synthetic stimulant banned by sports organizations and various

13  countries or that using DMAA can cause serious side effects. (*Id.* ¶ 50.) After using the Products in

14  accordance with the labeling instructions, both Plaintiff and his girlfriend experienced severe

15  adverse side effects, including feeling jittery and anxious when using the Products, having a racing

16  pulse rate and fast heart beat, and feeling exhausted when not using the Products. (*Id.* ¶ 51.)

17  Plaintiff would have never purchased or used the Products, or allowed his girlfriend to use the

18  Products, had he known the Products are not safe, natural and effective dietary supplements, as they

19  are advertised to be, but in fact are ineffective and contain DMAA, a banned and extremely

20  dangerous synthetic stimulant. (*Id.*)

21         In addition to being dangerous and potentially lethal, the DMAA in Defendants' Products is

22  purely synthetic. (Compl. ¶ 5.) Though DMAA is claimed to be an extract of geranium oil, most of

23  the DMAA contained in products currently on the market is wholly "synthetic" DMAA, completely

24  manufactured in laboratories, and is not derived from the geranium plant in any way whatsoever.

25  (*Id.*) Recent studies have also concluded that there is no DMAA in geranium oil at all, that DMAA

26  cannot be extracted from geranium oil, and that <u>all</u> DMAA on the market is synthetic. (*Id.* ¶ 31, Ex.

27  7 (excerpt from Interview with Ed Wyszumiala of NSF International), Ex. 8 ("AHPA: Review of

28  Research Shows DMAA Not Naturally From Geranium").) In fact, NSF International, a world

1    leader in standards development and product certification for over 65 years, and widely recognized

2    for its scientific and technical expertise in product certification, has publicly stated that it has tested

3    geranium oil down to a parts per billion screen, and DMAA is not derived from natural geranium oil;

4    it is a synthetic compound and not a natural constituent of the botanical geranium.  (*Id.* ¶ 31.)

5         Recently, the FDA issued warnings about over-the-counter sales of various fraudulent and

6    dangerous dietary supplements promoted mainly for bodybuilding and weight loss, as is the case

7    here.  (Compl. ¶ 10, Ex. 1 ("Tainted Products Marketed as Dietary Supplements"), Ex. 2 ("Beware

8    of Fraudulent Dietary Supplements").)  The FDA notes that such products often "contain hidden or

9    deceptively labeled ingredients," such as active ingredients contained in drugs required to be

10   approved by the FDA prior to marketing, or other compounds that do not qualify as dietary

11   ingredients.  (*Id.* ¶ 10, Ex. 2 at p. 1.)

### 2. The Labeling of Nutrex Products is Deceptive.

13        Although the Nutrex Products are labeled as "dietary supplements," their labeling and

14   marketing claims characterize the Products as having the ability to affect the structure and/or

15   function of the human body.  For instance, the labeling for certain Nutrex Products contains

16   statements such as:

17  - Use of Nutrex Products provides "freakish blood-engorged vascularity, tunnel-vision like
18    mental focus and clarity, coupled with record-shattering strength gains that will help
      propel your physique to new heights."  (Compl. ¶ 33, Ex. 3 (Hemo Rage Black Ultra
19    Concentrate).)

20  - Use of Nutrex Products "[i]nduces raging energy, expands blood volume, increases
      strength, hyper-activates pump effect, detonates fat and provides serious muscle-building
      compounds all in one."  (*Id.*)

21  - The Nutrex Products are "the world's first one-pill-only fat destroyer that combines
22    receptor cleansing and reprogramming agents with an ultra concentrated fat destroying
      complex. . . [And each] cleanses and reprograms receptor sites to support maximum cell-
23    to-cell communication. . . [and] hits the fresh receptor with an ultra concentrated fat
      destroying complex so powerful that all you need is a single pill."  (*Id.* ¶ 34, Ex. 4 (Lipo
24    6 Black Hers Ultra Concentrate and Lipo 6 Black Ultra Concentrate).)

25  - The Product "Contains the Powerful Thyroid Activator 3.5 Diiodo-L-Thyronine for
      Hyper-Active Fat Metabolization – Contains 3 Forms of Yohimbine for Maximum Fat-
26    Release in Targeted Trouble Areas – Activates Brown Adipose Tissue by Stacking 3
      Heat-Generating Phenylethylamines – Generates Significantly Increased Body Heat
27    (Thermogenesis) to Melt Away Fat Depositis."  (*Id.* ¶ 35, Ex. 5 (Lipo 6 Black).)

28  - Nutrex Products have "2 Powerful Thyronines for Hyper-Active Fat Metabolization –

1     Contains 3 Forms of Yohimbine for Maximum Fat-Release in Targeted Areas – Activates
2     Brown Adipose Tissue by Stacking Powerful Heat-Generating Compounds – Generates
      Significantly Increased Body Heat to Melt Away Fat Deposits." (*Id.*)

3       Based upon the deceptive and illegal conduct allegations discussed above, the Complaint

4 contends that Defendants engage in deceptive labeling and marketing of the Nutrex Products by

5 failing to inform consumers of material facts concerning the safety and effectiveness of the Nutrex

6 Products. (*Id.* ¶ 47.) Despite all of the above, Nutrex Products containing DMAA were falsely

7 advertised and labeled by Defendants as safe natural and effective dietary supplements. Defendants

8 fail to inform consumers, among other things: (1) that DMAA is included in the Nutrex Products; (2)

9 that DMAA was once marketed as a drug; (3) that DMAA is a purely synthetic compound; (4) that

10 DMAA is a dangerous central nervous system stimulant which is banned by WADA, MLB, Canada

11 and New Zealand; (5) that using the Nutrex Products can potentially cause extreme health dangers

12 and adverse health-related side effects, including death; (6) that using the Nutrex Products can cause

13 consumers to test positive for an illegal substance and/or amphetamine use; and (7) that DMAA is

14 not a "dietary ingredient" and thus Nutrex Products are not "dietary supplements." (*See id.* ¶¶ 46-

15 48.)

16       Defendants not only promise consumers that the Products are safe, they also assure

17 consumers the Products are effective and can produce amazing results. Defendants promise these

18 results knowing that none of the Products, nor any of the Products' individual ingredients at the

19 levels contained therein, can produce these promised results. Any existing efficacy studies regarding

20 the Products are on individual ingredients contained within the Products, and none of these studies

21 are on healthy humans with equivalent dosing or routes of administration. Therefore, such claims

22 are purely false advertising to induce consumers to spend their hard earned money on unproven

23 Products solely for the Defendants' monetary gain. (*Id.* ¶ 47.)

24     **B. DEFENDANTS VIOLATE THE SHERMAN LAW.**

25       The Sherman Law expressly incorporates all food labeling requirements set forth in the

26 FDCA by reference. Cal. Health & Safety Code § 110100(a). Pursuant to the Sherman Law, any

27 food is misbranded if its labeling does not conform to FDCA requirements. Cal. Health & Safety

28 Code §§ 110665, 110670, 110673. Plaintiff alleges violations of the Sherman Law based on the

FDCA requirements incorporated therein.

First, contrary to the labeling, the Nutrex Products are not "dietary supplements" because DMAA is not a "dietary ingredient." (Compl. ¶¶ 7, 30.) The FDCA defines a dietary supplement as "a product (other than tobacco) intended to supplement the diet" that contains one or more enumerated "dietary ingredients." 21 U.S.C. § 321(ff)(1). The dietary ingredients in such "supplements" may include a number of enumerated naturally occurring substances; such as vitamins, minerals, or herbs. Thus, a purely synthetic substance cannot be a dietary ingredient. *See* 21 U.S.C. 321(ff)(1)(F). Because DMAA is a purely synthetic substance, it is not a proper "dietary ingredient," and thus Defendants' Products which contain DMAA are not "dietary supplements," as those terms are defined and adopted by California's Sherman Law. (Compl. ¶ 30, Ex. 6 (FDA "Draft Guidance for Industry: Dietary Ingredient Notifications and Related Issues") at § IV.D.2.)

In addition, DMAA is not a dietary ingredient because it was once patented, marketed, and investigated as a "drug" for the treatment of various medical conditions and disorders. The FDCA provides that, if an article has been authorized for investigation as a new drug and such investigations are made public prior to such an article being sold as a dietary supplement, such an article may not be considered a dietary supplement. *See* 21 U.S.C. 321(ff)(3)(B)(i)-(ii). Since DMAA was investigated as the drug "Forthane" prior to being marketed as a dietary ingredient, and such investigations are publicly available, DMAA does not fall within the definition of a "dietary ingredient." (Compl. ¶ 43.)

Second, DMAA was not marketed as a dietary ingredient prior to October 15, 1994, and thus, if it is a dietary ingredient at all, it must be a "new dietary ingredient" as defined by the FDCA, and by California's Sherman Law by way of incorporation. The phrase "new dietary ingredient" means a dietary ingredient that was not marketed in the United States before October 15, 1994. *See* 21 U.S.C. 350b(c). The FDCA requires that manufacturers and distributors who wish to market dietary supplements that contain "new dietary ingredients" notify the FDA prior to marketing products containing such ingredients. Neither Defendants nor any other dietary supplement manufacturer have submitted a New Dietary Ingredient Application to the FDA for DMAA, and, therefore, DMAA does not meet the definition of a "dietary ingredient," as that term has been defined and

WASSERMAN, COMDEN, CASSELMAN & ESENSTEN, L.L.P.
5567 RESEDA BOULEVARD, SUITE 330
POST OFFICE BOX 7033
TARZANA, CALIFORNIA 91357-7033

adopted by California's Sherman Law. Defendants fail to inform consumers that, although DMAA is a new dietary ingredient, Defendants have failed to submit a New Dietary Ingredient Application to the FDA. (Compl. ¶ 44.)

Third, Defendants make illegal labeling claims regarding the effects of the Products on the structure and function of parts the human body that are essentially "drug" claims which cannot be made with respect to a dietary supplement in the absence of adequate labeling and adequate scientific substantiation. (*Id.* ¶¶ 32-36.) California's Sherman Law governs "structure/function claims" made for a dietary supplement. Cal. Health & Safety Code § 109925. The Sherman Law expressly incorporates the identical provision of the FDCA, and requires that such claims be made in accordance with Section 403(r)(6) of the FDCA. *Id.* Under Section 403(r)(6) of the FDCA, dietary supplement labeling may include claims about the supplement's effect on the structure or function of the human body (structure/function claims) only if certain requirements are met. 21 U.S.C. § 343(r)(6)(A). One of these requirements is that the manufacturer must be truthful and not misleading. 21 U.S.C. § 343(r)(6)(B). The structure/function claims made by Defendants regarding the Products are <u>not</u> truthful and <u>are</u> misleading, as discussed above, and any purported substantiation Defendants may have to support these structure/function claims is inadequate and also misleading. (*Id.* ¶¶ 37, 47.)

The FDA has previously warned manufacturers of "fat burner" products, like Defendants' Products, that claim their products "burn fat," are "thermogenic," or "suppress appetite" are structure/function claims requiring adequate scientific substantiation (and possibly even "disease claims" which cannot be made about dietary supplements *at all*, i.e., that so-called "fat burner" products can be used to cure or treat obesity). (Compl. ¶¶ 38-39, Ex. 10 (FDA June 21, 2005 "Extreme Fat Burner" Warning Letter), Ex. 11 (FDA Fat Burner / Synthetic Norephedrine Warning Letters).) Some of the "fat burner" products which the FDA has cited in the past for making improper structure/function claims were products which also contained synthetic stimulants, much like DMAA. (*Id.*)

Additionally, Defendants' structure/function claims for Nutrex Products are improper because they are not made with respect to any particular ingredient. Section 403(r)(6) of the FDCA

WASSERMAN, COMDEN, CASSELMAN & ESENSTEN, L.L.P.
5567 RESEDA BOULEVARD, SUITE 330
POST OFFICE BOX 7033
TARZANA, CALIFORNIA 91357-7033

only authorizes representations that describe the role of each nutrient or dietary ingredient intended to affect the structure or function of the body, or characterize the way in which a nutrient or dietary ingredient maintains the structure or function of the body.  21 U.S.C. § 343(r)(6)(A).  Here, the bodybuilding and "fat burner" structure/function claims made by Defendants regarding the Products violate California law in that such claims do not describe the effects of each nutrient or dietary ingredient included in the Products.  Instead, Defendants' claims are made with respect to the Nutrex Products as a whole, and thereby constitute improper and illegal labeling claims.  (Compl. ¶ 40.)

Fourth, the Nutrex Products are further misbranded under California's Sherman Law because the labeling for the Nutrex Products makes the unauthorized nutrient content claim that the Products are "Ultra Concentrate."  (*Id.* ¶ 41.)  The labeling for these Products makes this claim even when the "Supplement Facts" included on the packaging admit that most of the ingredients in the Products do not have established Reference Daily Intake ("RDI") or Daily Reference Value ("DRV") for most of the listed nutrients.  (*Id.*)  Nearly all of the few listed nutrients that do have an established RDI are well below 100%, and are closer to 25%, of the RDI.  Where such is the case, the provisions of the FDCA incorporated by the Sherman Law prohibit the use of such "Ultra Concentrate" claims.  21 U.S.C. § 343(r)(6); 21 C.F.R. § 101.54(f).

## III.  LEGAL STANDARD

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may bring a motion to dismiss for failure to state a claim upon which relief can be granted.  The Federal Rules require only that a plaintiff provide "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Plaintiff is not required to set forth specific facts; the allegations of the complaint need only "give the defendants fair notice of what the claim is and the grounds upon which it rests."  *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1122 (9th Cir. 2008) (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)).

The scope of review on a Rule 12(b)(6) motion to dismiss is limited to the contents of the complaint, exhibits submitted with the complaint, and matters of which the Court may take judicial notice.  *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990); *Mir v. Little Co. of Mary Hosp.*, 844 F.2d 646, 649 (9th Cir. 1988).  This Court must accept as true

all material allegations in the complaint, and any reasonable inferences to be drawn from them. *Doe v. United States*, 419 F.3d 1058, 1062 (9th Cir. 2005); *ARC Ecology v. U.S. Dep't of Air Force*, 411 F.3d 1092, 1096 (9th Cir. 2005); *Oki Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n*, 298 F.3d 768, 772 (9th Cir. 2002). Ultimately, the allegations need only be plausible on the face of the complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (court may not dismiss claims under 12(b)(6) if plaintiff alleges "enough facts to state a claim to relief that is plausible on its face"). If the Court grants the motion to dismiss, it should also grant leave to amend "even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000); *see Jackson v. Carey*, 353 F.3d 750, 758 (9th Cir. 2003) (citing *Chang v. Chen*, 80 F.3d 1293, 1296 (9th Cir. 1996)).

## IV. THE COURT SHOULD DENY DEFENDANTS' MOTION TO DISMISS BECAUSE PLAINTIFFS CLAIMS ARE SUPPORTED BY LEGALLY COGNIZABLE THEORIES.

Despite the hodgepodge of arguments in their Motion to Dismiss, Defendants essentially offer only three misguided and erroneous conclusions: (1) the FDCA preempts California labeling laws and consumer protection statutes; (2) the labeling and marketing of the Nutrex Products is not illegal under the FDCA; and (3) Defendants did not have a duty to disclose material information regarding the Products to consumers. As further discussed below, each argument fails in that Plaintiff is not seeking to enforce the FDCA, but rather Plaintiff seeks to hold Defendants liable for their failure to disclose material information regarding the nature, dangers and lack of efficacy of the Products, as well as information indicating that Defendants violate the Sherman Law and the FDCA.

### A. DEFENDANTS COMPLETELY MISCONSTRUES THE ENTIRE COMPLAINT.

The fallacy plaguing Defendants' entire Motion to Dismiss is the erroneous premise that Plaintiff is alleging violations of, and seeking to enforce, the FDCA or FDA regulations. (*See* Motion to Dismiss 10:13-12:17.) Contrary to Defendants' attempts to portray Plaintiff's Complaint as such, Plaintiff's Complaint does not seek to enforce FDCA or FDA regulations. Rather, the Complaint seeks to prevent Defendants from continuing to make deceptive labeling and marketing

1023752.1

3:12-CV-01060 LB

Plaintiff's Opposition to Defendant's Motion to Dismiss

WASSERMAN, COMDEN, CASSELMAN & ESENSTEN, L.L.P.
5567 RESEDA BOULEVARD, SUITE 330
POST OFFICE BOX 7033
TARZANA, CALIFORNIA 91357-7033

claims regarding the nature, efficacy, and safety of the Nutrex Products.  The Complaint expressly

rebuts Defendants' tortured construction of the Complaint.  In Paragraph 12, the Complaint alleges:

> Plaintiff brings this lawsuit, on behalf of himself and a putative class of California purchasers of the Products, to enjoin [Defendants] from selling the Products without informing consumers that DMAA is a potentially dangerous, synthetic, banned stimulant, and from making illegal and deceptive marketing claims regarding the effectiveness and safety of the Products.

(Compl. ¶ 12.)  Thus, Plaintiff merely seeks to preclude Defendants from selling the Products

without disclosing material facts.  The Complaint goes on to expressly state: "In this action, Plaintiff

does not sue to subject Defendants to the FDA pre-market approval or post-market regulatory

processes, but rather, to stop the false, deceptive, and often illegal labeling and advertising of the

Products under California law as described herein."  (*Id.* ¶ 49.)  Defendant completely ignores this

clear language establishing that Plaintiff does not seek to enforce the FDCA.

### B. THE COMPLAINT STATES COGNIZABLE CLAIMS AND DEFENDANTS DID NOT ATTACK ALL BASES FOR PLAINTIFF'S CAUSES OF ACTION.

While Defendants repeatedly deny violations of the FDCA, they fail to address Plaintiff's

*primary* theories of liability—deceptive and misleading labeling and marketing claims and

omissions concerning the safety and effectiveness of the Nutrex Products.  Dismissal under 12(b)(6)

is inappropriate where a claim is supported by *any* cognizable legal theory.  *Navarro v. Block*, 250

F.3d 729, 732 (9th Cir. 2001) ("Dismissal is proper only where there is *no* cognizable legal theory or

an absence of sufficient facts alleged to support a cognizable legal theory." (emphasis added)) (citing

*Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988)).  The thrust of Plaintiff's

Complaint is that Defendants fail to disclose information in the labeling and advertising for Nutrex

Products concerning the nature, effectiveness, and safety of the Products.  These failures to disclose

provide the basis for Plaintiff's CLRA claims (*see* Compl. ¶¶ 60-81), UCL claims (*see id.* ¶¶ 82-96),

FAL claim (*see id.* ¶¶ 97-105), breach of warranty claims (*see id.* ¶¶ 106-116), and restitution claim

(*see id.* ¶¶ 117-122).

The Complaint clearly alleges that the Nutrex Products are unsafe because they contain

DMAA, a dangerous stimulant that was previously marketed and investigated as a drug.  The purely

synthetic compound has been banned by sports organizations and various countries.  Experts and

1   scientific studies conclusively document the dangerous adverse side effects that result from ingesting

2   DMAA. DMAA has been linked to fatalities. When Plaintiff and his girlfriend ingested DMAA,

3   they too felt the adverse side effects, such as increased heart rate and feeling jittery. None of these

4   adverse health-related side effects are disclosed by Defendants. Indeed, Defendants do not disclose

5   that, because DMAA is in the Products, a consumer cannot obtain the promised results without

6   suffering the adverse health-related side effects. A failure to disclose information concerning the

7   safety and effectiveness of a product is an adequate basis for a claim under the CLRA, UCL, or

8   FAL. *Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d 1088, 1094-95 (N.D. Cal. 2007) (holding that

9   duty to disclose exists when failure to disclose involves safety risk); *see In re Steroid Hormone*

10  *Prods. Cases*, 181 Cal. App. 4th 145, 160 (2010) (case concerning the unlawful sale of a product

11  containing an illegal drug).

12      Defendants spend a substantial portion of their Motion arguing that their labeling and

13  marketing claims are not illegal. As fully discussed later, Defendants are wrong in their assertion

14  that their conduct is not unlawful. However, as a threshold matter, Plaintiffs' claims do not turn on a

15  showing of unlawful conduct in violation of the FDCA. A UCL claim is appropriate if the

16  defendants' conduct is *either* unlawful, <u>unfair</u>, or <u>fraudulent</u>. *In re Tobacco II Cases*, 46 Cal. 4th

17  298, 311 (2009); *see* Cal. Bus. & Prof. Code § 17200. Defendants do not argue that the Complaint

18  fails to adequately allege their conduct is "unfair" or "fraudulent" (i.e. likely to deceive a reasonable

19  person); thus, Plaintiff adequately pleads a cause of action under the UCL notwithstanding any

20  allegations of illegality. Moreover, Defendant's arguments concerning the legality of their conduct

21  under the FDCA cannot defeat Plaintiff's UCL claim based specifically on unlawful conduct,

22  because the UCL unlawful conduct claim is based not only upon violations of the Sherman Law, but

23  also violations of the FAL. Defendants fail to adequately challenge the deception that provides the

24  basis for the FAL action. In any event, the Ninth Circuit has held that determining whether a

25  business practice is deceptive is a question of fact not appropriate for resolution on a motion to

26  dismiss. *Williams v. Gerber Products Co.*, 552 F.3d 934, 938-39 (9th Cir. 2008) (citing cases

27  therein).

28      Because Defendants do not address the allegations of deceptive labeling and marketing based

WASSERMAN, COMDEN, CASSELMAN & ESENSTEN, L.L.P.
5567 RESEDA BOULEVARD, SUITE 330
POST OFFICE BOX 7033
TARZANA, CALIFORNIA 91357-7033

1  upon Defendant's failure to disclose material facts concerning the efficacy and safety of their

2  products, a legally cognizable theory supports each cause of action, and thus Defendant's Motion

3  should be denied in its entirety.

4  **C. THE FDCA HAS NO PREEMPTIVE EFFECT AND PLAINTIFFS' CLAIMS DO NOT REQUIRE**

5  **FDA INTERVENTION.**

6  While Defendants state that they are arguing preemption of the FDCA, it is clear from the

7  context of the arguments that most, if not all, of Defendants' arguments are "primary jurisdiction"

8  arguments. However, <u>both</u> arguments fail here because neither has any support in fact or law.

9  **1. Plaintiff's Claims Under California Consumer Protection Statutes And**

10  **Labeling Laws are Not Preempted by the FDCA.**

11  It is well-established that claims under California's consumer protection statutes and labeling

12  laws are ***not* preempted** by the FDCA. The United States Supreme Court has held that federal

13  preemption should be narrowly construed, and thus there is a presumption against federal

14  preemption of state laws. *See Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 523 (1992); *Maryland*

15  *v. Louisiana*, 451 U.S. 725, 746 (1981). In areas traditionally regulated by states, such as the

16  exercise of a state's police powers, Congress's intent to preempt state law must be "clear and

17  manifest." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). State laws such as California's

18  consumer protection statutes, which arise out of the state's inherent police powers, are thus subject

19  to a **strong presumption *against* preemption**. *See California v. ARC America Corp.*, 490 U.S. 93

20  (1989); *see also Wash. Mutual Bank v. Superior Court*, 95 Cal. App. 4th 606, 613 (2002); *Black v.*

21  *Financial Freedom Senior Funding Corp.*, 92 Cal. App. 4th 917, 926 (2001). The party asserting

22  federal preemption has the burden to demonstrate it exists. *See ARC America*, 490 U.S. at 101;

23  *Medtronic*, 518 U.S. at 485. Defendants have not satisfied their burden here.

24  Defendants' preemption argument is grounded in its incorrect presumption that Plaintiff is

25  attempting to assert violations of the FDCA. As explained above, Plaintiff is not asserting violations

26  of the FDCA as the foundation for its Complaint; rather, Plaintiff is asserting deceptive labeling and

27  marketing claims under California consumer protection statutes, some of which are based on

28  violations of California's Sherman Law. It is well-established that **the FDCA does not expressly**

WASSERMAN, COMDEN, CASSELMAN & ESENSTEN, L.L.P.
5567 RESEDA BOULEVARD, SUITE 330
POST OFFICE BOX 7033
TARZANA, CALIFORNIA 91357-7033

**preempt state laws or claims involving deceptive labeling or marketing.**  *Reese v. Payless Drug Stores Northwest, Inc.*, 43 Cal. App. 4th 1317, 1324-25 (1995); *Consumer Justice Center v. Olympian Labs, Inc*., 99 Cal. App. 4th 1056, 1059-66 (2002); *see also Wyeth v. Levine*, 555 U.S. 555, 574-81 (2009).

In *Wyeth*, the United States Supreme Court held that a state law claim based on a failure to disclose on a drug label, even though the label had been approved by the FDA, was not preempted by the FDCA.  *Id.* at 581.  The Court noted that Congress in fact intended for consumers harmed by unsafe or ineffective products to avail themselves of state law claims.  *Id.* at 574.  "Congress did not provide a federal remedy for consumers harmed by unsafe or ineffective drugs" when it passed the FDCA because "widely available state rights of action provided appropriate relief for injured consumers."  *Id.*  "If Congress thought state-law posed an obstacle to its objectives, it surely would have enacted an express pre-emption provision at some point during the FDCA's 70-year history."  *Id.*  But, despite enacting an express preemption provision for medical devices, it has yet to do so for drugs, food, or dietary supplements.  *Id.*  "Its silence on the issue, coupled with its certain awareness of the prevalence of state tort litigation, is powerful evidence that **Congress did *not* intend FDA oversight to be the exclusive means of ensuring drug safety and effectiveness**."  *Id.* at 575 (emphasis added).  Congress's decision not to preempt state law was partially based on the fact that "the FDA long maintained that state law offers an additional, and important, layer of consumer protection that *complements* FDA regulation."  *Id.* at 579 (emphasis added).  It follows that, under *Wyeth*, the FDCA does not preempt state law cases involving false advertising of dietary supplements in federal law under the FDCA.

Here, contrary to Defendants' assertion, Plaintiff does not seek a determination that Defendants' Products are drugs; rather, Plaintiff challenges the labeling and advertising of the Products, which carries certain implied connotations that would deceive a reasonable consumer into believing that the Nutrex Products are safe, effective, and legal dietary supplements, when, in reality, they are neither safe nor effective nor legal.  The discussion *In re Bayer Corp. Combination Aspirin Products Mktg. & Sales Practices Litigation*, 701 F. Supp. 2d 356 (E.D.N.Y. 2010), is instructive on this point.  In *Bayer*, the defendant argued that the FDCA preempted state law because the plaintiff's

WASSERMAN, COMDEN, CASSELMAN & ESENSTEN, L.L.P.
5567 RESEDA BOULEVARD, SUITE 330
POST OFFICE BOX 7033
TARZANA, CALIFORNIA 91357-7033

1    complaint alleged that the defendant was marketing a non-approved drug. *Id.* at 373. The court

2    disagreed, holding the FDCA did not preempt state law. The court reasoned that although the

3    complaint alleged defendant was marketing a non-approved drug in violation of the FDCA, the

4    primary basis for the complaint was grounded in deceptive marketing and labeling in that the

5    defendant misrepresented the effectiveness and safety of the product. *Id.* at 374. As in *Bayer*, the

6    FDCA has no preemptive effect here because the primary basis for Plaintiff's Complaint is grounded

7    in deceptive marketing and labeling based upon omissions and misreprsentations concerning the

8    safety and effectiveness of the Nutrex Products. Plaintiff is simply contending that, without

9    necessary disclosures, Defendants' labeling and marketing is deceptive in that reasonable consumers

10   are misled into believing that Nutrex Products are safe, effective, and legal dietary supplements.

11        Plaintiff seeks to hold Defendants liable for their deceptive omissions and representations, by

12   way of claims asserted under the UCL, the FAL, and the CLRA for ***misleading labeling and false***

13   ***advertising*** of their products in violation of California's Sherman Law, not by way of claims for

14   enforcement of FDCA provisions. The FDCA preempts state law only if state law is "different from

15   or in addition to" the federal requirements. 21 U.S.C. § 379r(a). As explained by the court in

16   *Consumer Justice Center*, courts may determine violations of California's Sherman law because the

17   state law is ***identical*** to the rules and remedies afforded under the FDCA. 99 Cal. App. 4th at 1059-

18   66. Subsequently, in *In re Farm Raised Salmon Cases*, 42 Cal. 4th 1077 (2008), the California

19   Supreme Court definitively resolved the preemption issue. Adopting the rationale of the *Consumer*

20   *Justice Center* Court, the California Supreme Court held that the FDCA does not preempt

21   consumers' false advertising and misleading labeling claims. *Id.* at 1086. The Supreme Court

22   further concluded that states may establish food labeling requirements identical to those in the

23   FDCA without raising an issue of preemption. *Id.* The California Supreme Court's rationale in the

24   *Farm Raised Salmon* case conclusively establishes that there is no preemption here.

25        Plaintiffs do not seek to enforce the FDCA; rather, their deceptive marketing claims are
          predicated on violations of obligations imposed by the Sherman Law, something that state
26        law undisputedly allows. [Citations omitted] That the Sherman Law imposes obligations
          identical to those imposed by the FDCA . . . does not substantively transform plaintiffs'
27        action into one seeking to enforce federal law. Rather, it merely reflects Congress's
          considered judgment that states should uniformly regulate food labeling using identical
28        standards.

WASSERMAN, COMDEN, CASSELMAN & ESENSTEIN, L.L.P.
5567 RESEDA BOULEVARD, SUITE 330
POST OFFICE BOX 7033
TARZANA, CALIFORNIA 91357-7033

1  *Id.* at 1095; *see also Chavez v. Blue Sky Natural Bev. Co.*, 268 F.R.D. 365 (N.D. Cal. 2010) (state

2  law claims arising from false or misleading labels not preempted by the FDCA).

3        In their Motion, Defendants argue that *Farm Raised Salmon* was incorrectly decided by the

4  California Supreme Court.  But Defendants fail to explain why or how, and fail to cite any federal

5  authority attacking the decision.  Significant, *Farm Raised Salmon* involved the exact same scenario

6  here: The plaintiffs attempted to use unfair competition laws to assert violations of the Sherman

7  Law, which incorporated the FDCA.  In attemptin to discredit *Farm Raised Salmon*, Defendants fail

8  to see the consequences of their position.  A finding that Plaintiff's claims are preempted by the

9  FDCA would be tantamount to holding that California cannot enforce its Sherman Law even though

10  the **FDCA expressly authorizes states to enact such laws**.  21 U.S.C. § 343-1(a); *see Farm Raised*

11  *Salmon*, 42 Cal. 4th at 1095; *Wyeth*, 555 U.S. at 574-81; *see also Williams v. Wells Fargo Bank*,

12  *N.A.*, CV 10-4761 PA PJWX, 2010 WL 3184248, at *3 (C.D. Cal. Aug. 9, 2010) (rejecting

13  defendant's argument that because plaintiffs' UCL claim was based upon federal statute, claim

14  preempted by federal statute; noting that no authority exists for such a position and that any such

15  authority would directly contradict the California Supreme Court's reasoning that the UCL

16  "'borrows' violations of others laws and makes them 'independently actionable'").

17        Contrary to Defendants' arguments, the FDCA preempts only when the requirements of state

18  law ***contravene*** the FDCA's requirements.  In *Astiana v. Ben & Jerry's Homemade, Inc.*, C 10-4387

19  PJH, 2011 WL 2111796 (N.D. Cal. May 26, 2011), the Honorable Phyllis J. Hamilton of this

20  District, explained: "Consumer protection laws (such as the UCL) are preempted if they seek to

21  impose requirements that contravene the requirements set forth by federal law." *Id.* at *8 (citing

22  *Wyeth*, 555 U.S. at 575).  There, the plaintiffs alleged that the defendants violated the UCL based

23  upon violations of the Sherman law by mislabeling their product as "all natural" and failing to

24  disclose that it contained some ingredients that were not "natural." *Id.* at *1, 10.  The plaintiffs

25  sought to enjoin the defendants from engaging in conduct that is "misleading." *Id.* at *10.  The

26  defendant argued that the NLEA section concerning nutrient content claims, 21 U.S.C. § 343(r)(1)—

27  the same section that Defendants claim preempts here (Defs.' Mot. to Dismiss 15:3-16:5)—

28  preempted the plaintiffs' claim under the UCL based upon the Sherman Law violations. *Id.* at *8.

Plaintiff's Opposition to Defendant's Motion to Dismiss

The court examined the statutory construction and legislative history of the FDCA to conclude:

> Congress intended to preempt **non**-identical requirements in the field of food labeling. The purpose of the NLEA, however, is **not to preclude all state regulation of nutritional labeling**, but to "prevent State and local governments from adopting inconsistent requirements with respect to the labeling of nutrients." H. Rep. No. 101–538, at 10 (1990). Moreover, Congress declared that the NLEA "**shall *not* be construed to preempt any provision of State law, unless such provision is expressly preempted under section 343– 1(a) of the FDCA.**" Pub.L. No. 101–535, 104 Stat. 2353, 2364 (Nov. 8, 1990).

*Id.* (emphasis added).

After analyzing similar cases concerning the preemptive effect of the FDCA and NLEA on labeling, the *Astiana* court held that neither the FDCA nor the NLEA had any preemptive effect on the nutrient content claim arguments. *Id.* at *10. The court reasoned that 21 U.S.C. § 343(r)(1) was identical to the Sherman Law violations that the plaintiffs asserted. *Id.* "**[T]he NLEA preempt[s] *only* state labeling requirements for artificial flavors, colors, or preservatives that [are] *different* from the FDCA requirements.**" *Id.* at *9 (emphasis added) (citing *Lockwood v. ConAgra Foods*, 597 F. Supp. 2d 1028, 1031-34 (N.D. Cal. 2009) (Breyer, J.)). As in *Astiana*, here, neither the FDCA nor the NLEA preempts Plaintiff's claims that Defendants violate provisions of the Sherman Law governing nutrient content claims. For instance, the Sherman Law's provisions governing structure/function "drug" claims are identical to those of the FDCA. *Cf.* Cal. Health & Safety Code § 109925 and 21 U.S.C. § 321(g)(1).

Plaintiff's requested relief here would not require Defendants to do anything beyond that is required by the FDCA. Indeed, Plaintiff simply seeks to require that Defendants truthfully disclose material facts concerning the nature, efficacy and safety of the Nutrex Products. Significantly, in *Delarosa v. Boiron, Inc.*, 818 F. Supp. 2d 1177 (C.D. Cal. 2011), the court held that plaintiff's claims that the defendant's marketing and labeling were false and misleading concerning efficacy were not preempted by the FDCA because, if the plaintiff's allegations were proven true, it "would simply require Defendant to truthfully state its efficacy or not sell its products; such relief would not impose a state requirement that is "different from or in addition to, or that is otherwise not identical with" that of the FDCA. *Id.* at 1189-90 (citing 21 U.S.C. § 379r(a)(2)).

Significantly, some of the most prominent California cases interpreting the UCL involve food labeling matters also covered by the FDCA. *See, e.g., Committee on Children's Television, Inc.*

WASSERMAN, COMDEN, CASSELMAN & ESENSTEN, L.L.P.
5567 RESEDA BOULEVARD, SUITE 330
POST OFFICE BOX 7033
TARZANA, CALIFORNIA 91357-7033

WASSERMAN, COMDEN, CASSELMAN & ESENSTEN, L.L.P.
5567 RESEDA BOULEVARD, SUITE 330
POST OFFICE BOX 7033
TARZANA, CALIFORNIA 91357-7033

1  *v. General Foods Corp.*, 35 Cal. 3d 197 (1983) (unfair competition claims allowed against

2  manufacturers of sugared cereals); *Consumers Union of U.S., Inc. v. Alta-Dena Certified*, 4 Cal.

3  App. 4th 963 (1992) (state court had power under UCL to order disclaimers and warning labels on

4  containers of raw milk).  And several California cases have specifically held that the UCL is the

5  proper statute to use for California state law claims involving FDCA issues.  *See Consumer Justice*

6  *Center*, 99 Cal. App. 4th at 1058-60; *Armstrong v. Optical Radiation Corp.*, 50 Cal. App. 4th 580,

7  595 (1997).  Logic would dictate that, since Congress has provided in the FDCA that states may

8  enact labeling laws "identical" to the provisions of the FDCA (*see* 21 U.S.C. § 343-1(a)(3)),

9  Congress would <u>not</u> then preclude states from entertaining claims to redress violations of those

10  states' own conforming labeling laws.

11     Moreover, under the Dietary Supplement Health and Education Act of 1994, prior to

12  marketing, a supplement manufacturer is responsible for determining that the dietary supplements it

13  manufactures are safe and effective, and that any representations or claims made about them are

14  substantiated by adequate evidence to show that the claims are not false or misleading.  Generally,

15  dietary supplements do not need approval from the FDA before they are marketed. Thus, supplement

16  manufacturers are essentially self-regulated and have sole responsibility for ensuring that their

17  dietary supplements are safe and effective before placing the products on the market.  (*See* Pl.'s Req.

18  for Judicial Not., Ex. 2.)  Because the supplement manufacturer, <u>and not the FDA</u>, has primary

19  responsibility for ensuring the safety and effectiveness of its products, and that labeling

20  representations and claims are true, it follows that a California consumer should be able to pursue

21  claims under the UCL, FAL and CLRA against a supplement manufacturer for deceptive labeling

22  and for marketing unsafe and ineffective products in violation of California's Sherman Law.

23     **2.   DEFENDANTS' PRIMARY JURISDICTION ARGUMENTS ARE UNAVAILING.**

24     Most, if not all, of Defendants' preemption arguments are in fact "primary jurisdiction"

25  arguments.  The primary jurisdiction doctrine is implicated when there is a pending issue within the

26  special competence of an administrative agency.  *Chavez*, 268 F.R.D. at 373 (quoting *Clark v. Time*

27  *Warner Cable*, 523 F.3d 1110, 1114 (9th Cir. 2008)).  Invocation of the doctrine does not indicate

28  that the court lacks jurisdiction; rather, it is a "prudential doctrine" under which a court determines

WASSERMAN, COMDEN, CASSELMAN & ESENSTEN, L.L.P.
5567 RESEDA BOULEVARD, SUITE 330
POST OFFICE BOX 7033
TARZANA, CALIFORNIA 91357-7033

1   whether an otherwise cognizable claim implicates a complex issue of first impression that Congress

2   has specifically committed to a regulatory agency, and whether protection of the regulatory scheme

3   dictates preliminary resort to the agency.  *Id.*  Courts have considerable discretion and flexibility to

4   avoid application of the primary jurisdiction doctrine.  *See South Bay Creditors Trust v. General*

5   *Motors Acceptance Corp.*, 69 Cal. App. 4th 1068, 1081-82 (1999).  Moreover, the proper procedure

6   in applying the doctrine of primary jurisdiction is not to dismiss the action, but to stay the action

7   pending the administrative agency's resolution of issue.  *Id.* at 1081.

8        Here, this Court certainly has the expertise to adjudicate claims of deceptive advertising

9   under California's unfair competition and consumer protection laws based on violations of

10   California's Sherman Law.  As recognized by the Supreme Court in *Wyeth*, the FDA has

11   traditionally regarded state law in this area as an additional layer of consumer protection that

12   ***complements*** the FDA regulation.  555 U.S. at 579.  Therefore, there is simply no need for this

13   Court to defer to the FDA in ruling upon Plaintiff's claims under California's consumer protection

14   statutes which are based on violations of the Sherman Law.

15       **D.  DEFENDANTS HAD A DUTY TO DISCLOSE YET FAILED TO DISCLOSE.**

16        A defendant has a duty to disclose, such that his omission constitutes actionable fraud in

17   violation of the CLRA, UCL, or FAL, in four circumstances:

18       (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant
     had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant
19   actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial
     representations but also suppresses some material fact.

20

21   *Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d 1088, 1094-95 (N.D. Cal. 2007) (quoting *LiMandri v.*

22   *Judkins*, 52 Cal. App. 4th 326, 337 (1997)).

23        Here, Defendants' duty to disclose arises out of the second, third, and fourth factors.  The

24   Complaint alleges that Defendants' misrepresentations and omissions in its labeling and marketing

25   are material, and Defendants do not challenge the materiality of those alleged misrepresentations and

26   ommissions.  (*See* Compl. ¶¶ 48(c), 56, 73, 103.)  Contrary to Defendants' assertions in their

27   Motion, Plaintiff *does* allege Defendants' exclusive and/or superior knowledge, active concealment,

28   and partial representations of material facts.  The Complaint alleges that Defendants "knowingly"

1   withhold material facts (*id.* ¶ 48) from "unknowing consumers" (*id.* ¶ 46). At the time he purchased

2   the Products, Plaintiff did not know that the products were not safe, natural, effective, and legal

3   dietary supplements, and, had he known as much, he would not have purchased the Products. (*Id.* ¶

4   51.) The Complaint also alleges that Defendants make promises and misrepresentations "knowing

5   that none of the Products, nor any of the Products' individual ingredients at the levels contained

6   therein, can produce these promised results." (*Id.* ¶¶ 47, 55(o).) The Complaint goes on to allege

7   that despite their knowledge, Defendants continue to knowingly omit material facts concerning the

8   efficacy and safety of the Nutrex Products and falsely advertise the Nutrex Products as having

9   benefits which they do not possess. (*Id.* ¶ 48.) Accordingly, the Complaint adequately alleges

10  Defendants' superior knowledge, active concealment, and partial representations of material facts,

11  and thus adequately alleges a duty to disclose, which is all that is required at this stage to support

12  Plaintiff's causes of action. *See Goldsmith v. Allergan, Inc.*, CV 09-7088 PSG EX, 2011 WL

13  2909313, at *5 (C.D. Cal. May 25, 2011) (denying motion to dismiss plaintiff's claims under

14  California's consumer protection statutes because plaintiff adequately pled a duty to disclose and

15  remaining questions affecting defendant's liabilities were questions of fact for the trier of fact).

16      In a related argument, Defendants argue that they adequately disclosed the ban on DMAA by

17  sports organizations. However, defendants' purported disclosure is not an adequate disclosure

18  because it simply states that the "product contains ingredients that may be banned by some sports

19  organizations." (Defs.' Mot. to Dismiss 3:26-28.) This statement fails to disclose that the ingredient

20  at issue is DMAA, that DMAA <u>has been</u> (as opposed to "may be") banned by some sports

21  organizations and is totally prohibited by some countries, that DMAA was previously marketed as a

22  drug, and that the use of DMAA is potentially hazardous to the health of consumers. Moreover, a

23  disclosure or disclaimer on the back or side of product packaging does not excuse

24  misrepresentations on the front of the packaging, as a matter of law. In *Williams v. Gerber Products*

25  *Co.*, 552 F.3d 934 (9th Cir. 2008), the Ninth Circuit held that a reasonable consumer is not expected

26  to look at the back of the product when the front of the package contains misrepresentations. *Id.* at

27  939-40. Plaintiff's Complaint alleges that the front of the package contains misrepresentations and

28  omissions concerning the effectiveness and safety of the Nutrex Products. Thus, the disclosure

WASSERMAN, COMDEN, CASSELMAN & ESENSTEN, L.L.P.
5567 RESEDA BOULEVARD, SUITE 330
POST OFFICE BOX 7033
TARZANA, CALIFORNIA 91357-7033

1   needs to be prominently displayed on the front and cannot be hidden in fine print on the back.  *See*

2   *Miles Labs., Inc. v. Superior Court*, 133 Cal. App. 3d 587, 596 (1982) (where disclosure is

3   ambiguous, disclosure cannot insulate manufacturer from liability as a matter of law).

4          In any event, Defendants' adequate disclosure argument is improper at this juncture.  The

5   question of whether a disclosure is adequate is "a question of fact for the trier of fact and peculiarly

6   inappropriate for resolution at the pleading stage."  *Cox v. Aurora Elecs., Inc.*, CV 93-3292 DT

7   (JGX), 1993 WL 652792, at *5 (C.D. Cal. Oct. 18, 1993) (quoting *Marx v. Comp. Science Corp.*,

8   507 F.2d 485, 492 (9th Cir. 1974)); *XOMA Corp. Sec. Litig.*, C-91-2252 TEH, 1990 WL 357807, at

9   *3 (N.D. Cal. Dec. 27, 1991) ("While it is true that defendants made some disclosures, the questions

10  of whether *material* facts were withheld and whether the disclosures were *adequate* are factual

11  questions not proper for 12(b)(6) dismissal." (emphasis in original)) (quoting *In re Apple Comp. Sec.*

12  *Litig.*, 886 F.2d 1109, 1115 (9th Cir. 1989)); *In re Sunrise Techs. Sec. Litig.*, C-92-0948TEH, 1992

13  WL 359636, at *6-7 (N.D. Cal. Sept. 22, 1992) ("It is clear that question of whether *material* facts

14  were withheld that whether the disclosures were *adequate* are factual questions not proper for

15  12(b)(6) dismissal." (emphasis in original)); *Stickrath v. Globalstar, Inc.*, 527 F. Supp. 2d 992, 1000

16  (N.D. Cal. 2007); *Peviani v. Natural Balance, Inc.*, 774 F. Supp. 2d 1066, 1071-72 (S.D. Cal. 2011).

17         E.  **DEFENDANT'S CONDUCT IS UNLAWFUL.**

18         Believing that FDCA violations are a major focus of the litigation, Defendants devote the

19  major bulk of their Motion arguing that the labeling and marketing for the Nutrex Products is not

20  unlawful under the FDCA.  In support of this argument, Defendants argue that DMAA and the

21  Nutrex Products are not drugs, that they do not make drug claims, that they do not make unlawful

22  structure/function claims, that they do not make unlawful nutrient content claims, and that their

23  "Ultra Concentrate" representations are not actionable.  Defendants are wrong on each count.

24              **1.  Contrary to Defendants' Arguments, Because DMAA is Not a "Dietary**

25                  **Ingredient," Nutrex Products are Not Dietary Supplements.**

26         As previously discussed, DMAA is a harmful wholly synthetic stimulant that has numerous

27  and significant health related adverse, and potentially lethal, side effects.  Nutrex Products are

28  improperly labeled as "dietary supplements" because DMAA is not a dietary ingredient and was

WASSERMAN, COMDEN, CASSELMAN & ESENSTEN, L.L.P.
5567 RESEDA BOULEVARD, SUITE 330
POST OFFICE BOX 7033
TARZANA, CALIFORNIA 91357-7033

1    previously marketed as a drug. A "dietary supplement" is an article that contains a wide variety of

2    enumerated naturally occurring substances, such as vitamins, minerals, herbs or other botanicals,

3    amino acids, and substances such as enzymes, organ tissues, glandulars, and metabolites. 21 U.S.C.

4    § 321(ff)(1). Dietary supplements can also be extracts or concentrates. *Id.* The FDA has stated,

5    however, that purely synthetic substances cannot be dietary ingredients. *See* 21 U.S.C. §

6    321(ff)(1)(F); (*see also* Compl. Ex. 6 (FDA "Draft Guidance for Industry: Dietary Ingredient

7    Notifications and Related Issues" at § IV.D.2).) DMAA is not natural and is wholly synthetic.

8    (Compl. ¶ 31.) In fact, all DMAA is synthetic, including the DMAA in Nutrex Products. (*Id.* ¶¶ 5,

9    31, Ex. 7 (excerpt from Interview with Ed Wyszumiala of NSF International), Ex. 8 ("AHPA:

10   Review of Research Shows DMAA Not Naturally From Geranium").) Since the DMAA used in

11   Nutrex Products is not a dietary ingredient, Nutrex Products cannot be a dietary supplement.

12   While Defendants argue that dietary supplements need not be "all natural," this argument is

13   misguided and contrary to FDA interpretations. It is misguided because the focus is not on whether

14   dietary supplements must contain only *natural* ingredients, but rather whether dietary supplements

15   must contain only *dietary* ingredients. Of course, all dietary ingredients, as defined by the FDCA,

16   are naturally occurring substances, or are extracts or derived from, naturally occurring substances.

17   Defendants further argue that the FDCA allows dietary supplements to contain synthetic vitamins.

18   However, vitamins are one of the enumerated "dietary ingredients," and it is not inconsistent with

19   the concept of naturally occurring dietary ingredients for the FDCA to make an exception for

20   "synthetic vitamins," which the agency has determined are no different "natural" vitamins. On the

21   other hand, DMAA is a wholly synthetic, man-made chemical compound that has no relationship

22   whatsoever to any substance listed in 21 U.S.C. § 321(ff)(1). Significantly, defendants do not

23   dispute the fact that dietary supplements must contain dietary ingredients.

24   By representing that the Nutrex Products containing DMAA, a synthetic substance formerly

25   marketed as a drug, are "dietary supplements," Defendants imply and mislead consumers into

26   believing that the products are "all natural" and contain only proper dietary ingredients.

27   **2. Defendants Make Illegal Drug Claims on the Labeling of Nutrex Products.**

28   While Plaintiff's claims do not turn on whether the Nutrex Products are drugs, it is important

1  to note that Defendants' argument that the Nutrex Products are not drugs, as a matter of law, is

2  clearly erroneous.  A "drug" is an article that is "intended" to be used in the diagnosis, cure,

3  mitigation, treatment, or prevention of disease in man or other animals or an article (other than food)

4  that is intended to be used to affect the structure or any function of the body of man or other animals.

5  Cal. Health & Safety Code § 109925; *see also* 21 U.S.C. § 321(g)(1).  "Intent" of the labeler is

6  determined by reviewing the labeling as well as promotional material, and advertising.  *United States*

7  *v. An Article Consisting of 216 Cartoned Bottles, More or Less*, 409 F.2d 734, 739 (2d Cir. 1969).[2]

8  Thus, if the labeling of a product makes "disease" or "structure/function" claims (collectively, "drug

9  claims"), the product may be treated like a drug by the FDA.

10       Here, the drug claims on the labeling of the Nutrex Products clearly evidence Defendants'

11  intent for the Nutrex Products to be used in a manner that affects the structure and/or function of a

12  person's body, similar to a drug.  As discussed above, the Nutrex Products' labels claim that

13  ingesting the products can maximize muscle cell communication, increase blood flow, muscle, and

14  focus, and "destroy," "detonate," "metabolize," and "melt away" fat.  (Compl. ¶¶ 33-36, Exs. 3-5.)

15  The FDA has often warned manufacturers of "fat burner" products, such as Defendants' Products,

16  that claim their products "burn fat," are "thermogenic," or "suppress appetite," that such claims are

17  structure/function claims requiring adequate scientific substantiation.  (*Id.* ¶ 38, Exs. 10-11.)  It

18  follows that by their own labeling and advertising claims, Defendants characterize the Nutrex

19  Products as substances affecting the structure and/or function of the human body.  (*Id.* ¶ 37.)

20       While an exception permits dietary supplements to make structure/function claims without

21  being considered a drug, if there is adequate substantiation and adequate labeling explanations for

22  such claims (which Plaintiff alleges are both absent), a requirement for that exception is that the

23  structure/function claims must be "truthful and not misleading."  21 U.S.C. § 321(g)(1).  Since the

24  _____

25  [2] Since this inquiry turns upon Defendants' intent, this is a question of fact not appropriate for
resolution on a motion to dismiss.  *Solid Host, NL v. Namecheap, Inc.*, 652 F. Supp. 2d 1092, 1119

26  (C.D. Cal. 2009) ("the issue of intent is not appropriate for resolution on a motion to dismiss")
(quoting *Barnett v. Carnival Corp.*, No. 06–22521–CIV, 2007 WL 1746900, at *4 (S.D. Fla. June

27  15, 2007)).

28

WASSERMAN, COMDEN, CASSELMAN & ESENSTEN, L.L.P.
5567 RESEDA BOULEVARD, SUITE 330
POST OFFICE BOX 7033
TARZANA, CALIFORNIA 91357-7033

thrust of Plaintiff's Complaint is misleading labeling claim and ommissions, the exception does not

apply here.  Nor does the exception apply to disease claims.  The statute clearly provides that dietary

supplements cannot make disease claims *under any circumstances*.  21 U.S.C. § 321(g)(1)(B).

Because the Complaint alleges that the labeling for Defendants' "fat burner" products claiming that

the products can be used to cure or treat obesity disease claims amounts to a disease claim (*see*

Compl. ¶ 38.), the Complaint adequately alleges illegal conduct in violation of the Sherman Law.

Defendants' structure/function claims further violate the Sherman Law because they do not

describe the effects of each nutrient or dietary ingredient intended to affect the structure or function.

*See* 21 U.S.C. § 343(r)(6)(A).

### 3. Defendants' "Ultra Concentrate" Labeling Claim is an Unauthorized Nutrient Content Claim.

Defendants' use of "ultra concentrate" on their labeling without indicating to which

ingredients the claim relates constitutes misbranding in violation of the Sherman Law.  California

law only allows "high potency claims," such as "maximum" and "ultra," to be used to describe

nutrients which are present at 100% or greater of the Reference Daily Intake ("RDI") per reference

amount customarily consumed.  21 C.F.R. § 101.54(f); *see* 21 U.S.C. § 343(r)(1)(A).  In their

Motion, Defendants argue that they are not subject to the "high potency claims" requirements

because the "ultra concentrate" labeling representation on Nutrex Products does not refer to any

specific nutrient, but rather the product as a whole.  However, the "high potency claims"

requirements <u>are</u> applicable when such a labeling claim is used to describe the product as a whole.

Indeed, where the "high potency claim" is used on the labeling to describe the product as a whole,

the product must contain 100% or more of the RDI for at least two-thirds of certain enumerated

vitamins and minerals, such as vitamins A, B, C, D, E, and K, folic acid, calcium, and iron, that are

in the product.  21 C.F.R. § 101.54(f)(2).  Here, Plaintiff's Complaint alleges that the "ultra

concentrate" representations on the labeling of the Nutrex Products do not relate to any specific

ingredients, and that the "nutritional information" for the Nutrex Products proves that it does *not*

contain at least 100% of the RDI of more than two-thirds of the enumerated vitamins and minerals.

(Compl. ¶ 41.)  The nutritional information for the Nutrex Products proves that the Products do not

have 100% of any of these vitamins and minerals, much less two-thirds of them. (*See, e.g.*, Compl. Ex. 3 at 74 (Vitamin D, Folic Acid, Vitamin B, and Calcium each at 25%; Iron at 75%.)

Defendants also present the remarkable argument that "high potency claims" are strictly limited to those which expressly state "high potency" and nothing else. Contrary to Defendants, representation "high potency claims" represent a group of claims regarding high potency. "Ultra concentrate" is an example of a "high potency claim" because the use of the word "ultra concentrate," much like the use of the word "high potency," implies that it carries levels that are stronger than a consumer would customarily consume in a typical food or dietary supplement. *See United States v. Undetermined Quantities of Articles of Drug*, 145 F. Supp. 2d 692, 699 (D. Md. 2001) (labels that state "high potency" and "ultra potency" found to evidence intent to alter mind of consumer).

## V.     ALTERNATIVELY, THE COURT SHOULD GRANT LEAVE TO AMEND.

Should the Court somehow be inclined to grant Defendants' Motion to Dismiss, or any portion thereof, the Court should grant Plaintiff leave to amend the Complaint. "A district court abuses its discretion by denying leave to amend unless amendment would be futile or the plaintiff has failed to cure the complaint's deficiencies despite repeated opportunities." *AE ex rel. Hernandez v. County of Tulare*, 666 F.3d 631, 636 (9th Cir. 2012).

## VI.     CONCLUSION

Based on the foregoing, the Court should deny Defendants' Motion to Dismiss in its entirety. Alternatively, the Court should grant Plaintiff with leave to amend.

DATED: April 27, 2012                    Respectfully submitted,

**WASSERMAN, COMDEN,
CASSELMAN & ESENSTEN, L.L.P.**


By:  /s/ Gregory B. Scarlett
        GREGORY SCARLETT
        Attorneys for Plaintiff, Stephen J. Rush, individually and
        on behalf of all others similarly situated

WASSERMAN, COMDEN, CASSELMAN & ESENSTEN, L.L.P.
5567 RESEDA BOULEVARD, SUITE 330
POST OFFICE BOX 7033
TARZANA, CALIFORNIA 91357-7033

WASSERMAN, COMDEN, CASSELMAN & ESENSTEN, L.L.P.
5567 RESEDA BOULEVARD, SUITE 330
POST OFFICE BOX 7033
TARZANA, CALIFORNIA 91357-7033

## CERTIFICATION OF SERVICE

I hereby certify that on April 27, 2012 I electronically filed a document entitled "Plaintiff's Opposition to Defendants Jen O. Ingenohl and Nutrex Research, Inc.'s Motion to Dismiss Plaintiff Stephen J. Rush's Complaint" with the Clerk of the Court using the CM/ECF system.

Respectfully Submitted,


/s/Gregory B. Scarlett
Gregory B. Scarlett

WASSERMAN, COMDEN, CASSELMAN & ESENSTEN, L.L.P.
5567 RESEDA BOULEVARD, SUITE 330
POST OFFICE BOX 7033
TARZANA, CALIFORNIA 91357-7033

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28